RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

IN RE: CRAIG STEVEN ROMANZI,

                    *Debtor*.

─────────────────────────────────────

KENNETH A. NATHAN, as Trustee of the Estate of Craig S. Romanzi,

          *Plaintiff-Appellee/Cross-Appellant*,

     *v*.

FIEGER & FIEGER, P.C.,

          *Defendant-Appellant/Cross-Appellee*.

Nos. 20-2278/21-1004

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit;
2:18-cv-11375—Gershwin A. Drain, District Judge.

United States Bankruptcy Court for the Eastern District of Michigan at Detroit;
Nos.; 2:16-bk-43857—Maria L. Oxholm; 2:16-ap-04672—Marci B. McIvor, Judge.

Argued: December 7, 2021

Decided and Filed: April 8, 2022

Before: BOGGS, THAPAR, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Robert G. Kamenec, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Fieger & Fieger, P.C. B.A. Tyler, THE TYLER LAW FIRM, PLLC, Troy, Michigan, for Kenneth A. Nathan. **ON BRIEF:** Robert G. Kamenec, PLUNKETT COONEY, Bloomfield Hills, Michigan, Geoffrey N. Fieger, Sima G. Patel, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., for Fieger & Fieger, P.C. B.A. Tyler, THE TYLER LAW FIRM, PLLC, Troy, Michigan, for Kenneth A. Nathan.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.   Attorney Craig Romanzi referred a lucrative personal-injury case to his employer, the law firm of Fieger & Fieger, P.C. (the "Firm"); meanwhile, creditors were winning hundreds of thousands of dollars in default judgments against him.  The personal-injury case settled for $11.9 million—about $3.55 million of which was awarded as attorney's fees—after Romanzi had quit the Firm.  Romanzi's employment at Fieger & Fieger entitled him to a third of the fees as the originating attorney, his intervening departure notwithstanding.  But before Romanzi could claim his due, his creditors forced him into involuntary Chapter 7 bankruptcy.  The appointed trustee, Kenneth Nathan (the "Trustee"), commenced this adversary proceeding against the Firm to recover Romanzi's third of the settlement fees on behalf of the bankruptcy estate.

The bankruptcy court granted summary judgment to the Firm on the Trustee's conversion claim but allowed the claims for breach of contract and quantum meruit to proceed to trial before the district court.  Rather than face a jury, however, the parties agreed to submit to arbitration and abide by a panel's "brief reasoned decision."  Two of the three arbitrators found for the Trustee in a single-paragraph decision that, while certainly brief, was not reasoned to the Firm's satisfaction.  The district court agreed and remanded to the arbitrators for clarification rather than vacating the award.  On remand, the panel asked for submissions from both parties, which the Trustee provided; the Firm refused to participate at all.  The arbitrators' subsequent supplemental award, approved by the district court, awarded the Trustee the fees owed to Romanzi, plus interest.

Fieger & Fieger now appeals, alleging that (1) remand was inappropriate and the district court should instead have vacated the award, (2) the arbitrators' decision on remand was barred by the doctrine of *functus officio*, and (3) the supplemental award should likewise have been vacated.   Nathan, cross-appealing, seeks to revive the conversion claim dismissed by the bankruptcy court.

Neither party's critique of the lower courts is persuasive.  As to Fieger & Fieger's claims, none of the grounds for vacating an arbitral decision apply, and remand was appropriate under the clarification exception to *functus officio*.  As to Nathan, he failed to present evidence for a key element of his statutory-conversion claim.  We therefore affirm the judgments of the district court and bankruptcy court.

I

During Craig Romanzi's period of employment at Fieger & Fieger, the standard compensation package entitled a lawyer who brought a case to the Firm to one-third of any future attorney's fees in that case.  In 2014, following a fatal collision between a tractor-trailer and a passenger vehicle that killed three members of the Thomas family, the Thomases sought out Romanzi for legal representation.  Romanzi referred the case to the Firm but quit his job less than a year later.  Seven months after that, in September 2015, the case settled for $11.9 million.  The settlement order awarded the Firm approximately $3.55 million[1] in attorney's fees—30 percent of the total settlement amount—plus costs.  The Firm did not pay any of that sum to Romanzi.

In 2016, Romanzi was forced into involuntary Chapter 7 bankruptcy due to events unrelated to his tenure at the Firm.[2]  The creditors who brought the Chapter 7 petition provided evidence of nearly a million dollars in unpaid default judgments against Romanzi, at which point the bankruptcy court appointed Kenneth Nathan as Trustee to manage the estate.  After taking stock of Romanzi's assets, the Trustee sued the Firm in an adversary proceeding to recover Romanzi's portion of the Thomas settlement—the crux of the current litigation.

---

[1]Lawyers and math often do not mix, and the precise amount of money awarded to the Firm has varied depending on who is doing the counting.  For example, the arbitrators in the present litigation calculated $3,547,514.24, but during the course of the Thomas litigation the head of Fieger & Fieger described fee amounts totaling $3,925,441.10.  The correct amount, tabulated by adding together each of the fee amounts that the Michigan state trial court awarded to the estates of the three members of the Thomas family—$1,267,513.70, $1,237,513.70, and $1,042,513.70—appears to be $3,547,541.10.

[2]Involuntary Chapter 7 proceedings provide relief to creditors when a debtor refuses to pay undisputed "debts as such debts become due," and allow for the appointment of an interim trustee to preserve the estate. 11 U.S.C. § 303(a), (b)(1), (h)(1), (g).

The Trustee claimed before the bankruptcy court that (1) the Firm had breached its fee-sharing agreement with Romanzi by failing to distribute to him one-third of the $3.55 million fee award, (2) the Firm owed damages in quantum meruit, and (3) failure to distribute the agreed-upon amount constituted conversion under Michigan law, meaning the Trustee was entitled to treble damages. The parties then cross-moved for summary judgment solely on the issue of the Trustee's conversion claim.

At a hearing in 2017, the bankruptcy court granted summary judgment for the Firm and dismissed the conversion claim. The court cited a number of Michigan state cases on statutory and common-law conversion that laid out the "very specific requirements to establish conversion" with respect to money (as opposed to other forms of property), and found that the Trustee had not met those requirements. Concerning statutory conversion in particular, the court laid out three elements: "one, that debtor had an established property interest in a specific sum of money; two, that defendant converted that property; and, three, that defendant converted the property to its own use." After holding that the first two elements were not established due to the lack of any property interest by Romanzi, the court went on to explain with respect to the third element that "the trustee concedes that he has no idea what happened to the fees paid to the firm"—and thus that he had presented no evidence of conversion to the Firm's "own use." The bankruptcy court therefore dismissed the conversion claim, while allowing the Trustee's claims for breach of contract and quantum meruit to proceed.

In 2018, the district court withdrew the reference on motion of the parties, taking control of the case, and the parties prepared for trial. But in 2019, before trial could commence, the parties agreed to binding arbitration and stayed the district-court proceedings pending the outcome. The signed arbitration agreement provided that a majority of three arbitrators[3] were to "render a brief reasoned decision" that "shall include all claims and defenses of the parties." The arbitrators' award would only be appealable to the district court "to confirm the arbitration decision" or "for the grounds set forth in 9 U.S.C. § 10(a) or 9 U.S.C. § 11"—the Federal

---

[3]The Trustee appointed one arbitrator, the Firm another, and those two together selected a third, neutral arbitrator.

Arbitration Act. After a four-day hearing, two of the three arbitrators found in favor of the Trustee. The decision read in its entirety as follows:

> The panel having been duly sworn to decide this case fairly and upon the evidence, and after considering the pleadings, the testimony and evidence presented at the hearings, the Panel, as of November 18, 2019, has decided in full and final resolution of the issues submitted for determination that Respondent [Firm] is liable for and shall pay to Claimant [Trustee] damages, including interest to date, in the amount of $1,325,247.84.

The decision did not specify which claim or claims the Trustee had prevailed on, how much of the award constituted Romanzi's share of the approximately $3.55 million fee from the Thomas litigation and how much was interest, or how the arbitrators had calculated the award. The third arbitrator registered his dissent in its entirety as follows: "I respectfully dissent from the Majority Opinion."

Pursuant to the arbitration agreement, the Trustee moved in the district court to confirm the award, while the Firm, unhappy with the decision, opposed the motion and moved instead to vacate. The Firm alleged that several procedural and substantive deficiencies in the arbitrators' decision process violated 9 U.S.C. § 10(a). The Firm also suggested that the brevity of the award violated the agreement's requirement that the arbitrators produce a "brief *reasoned* decision." Rather than granting either motion, the district court in 2020 remanded the issues to the arbitrators "for clarification." The court reasoned that vacating would be inappropriate under § 10(a), including for "manifest disregard of the law," but went on to hold that the arbitrators' decision had not been "reasoned" because it failed to "include all claims and defenses of the parties" as set forth in the agreement. Specifically, the decision failed to identify which claim the Trustee prevailed on—breach of contract or quantum meruit (or both). The district court's remand order instructed the arbitrators to provide "the following information: 1) A discussion of Plaintiff's claims, 2) A discussion of Defendant's defenses, 3) The Arbitrators' justification for the award." Just under three months had passed since the initial award.

Counsel for the Trustee forwarded the remand order by email to the arbitrators, copying the Firm's counsel, but the panel took no action. The Trustee's counsel again emailed the arbitrators, this time offering "a Proposed Reasoned Decision . . . in the spirit of bench trials

where Proposed Findings of Fact and Conclusion of Law are requested and/or required." After the dissenting arbitrator protested, the Trustee's counsel agreed to wait for an order from the arbitrators before filing proposed findings—an order the panel issued the next day. The panel requested views on what the district court had asked for: (1) plaintiff's claims, (2) defendant's defenses, and (3) proposed findings. The Trustee responded by attaching a nine-page proposed arbitration award; the Firm did not respond.[4]

The arbitrators then issued a supplemental award, laying out in detail the reasoning behind their earlier decision and calculating the amount to which the Trustee was entitled, with interest. The figures in the supplemental award exactly matched the (inaccurate) calculations presented in the Trustee's proposed award.[5]

The parties again filed dueling motions: the Trustee moved to confirm the supplemental award and the Firm moved to vacate it. The district court again rejected each of the Firm's arguments that the award should be vacated, along with additional challenges based on the decision to remand and the arbitrators' behavior. And this time the court granted the Trustee's motion to confirm. Judgment was entered in the amount calculated by the supplemental award: $1,182,513.74, plus continuing interest. The Firm appealed, and the Trustee cross-appealed the bankruptcy court's earlier interlocutory dismissal at summary judgment of its conversion claim.

II

The Firm raises three sets of challenges to the winding proceedings that have led us here. First, it argues that, under the Federal Arbitration Act, the original award was tainted and should have been vacated by the district court. *See* 9 U.S.C. § 10(a). Second, it asserts that the act of remanding by the district court—and the powers exercised by the arbitrators on remand—violated the doctrine of *functus officio*. And third, it claims that the supplemental award, too,

---

[4]Counsel for the Firm appears to have objected on the ground that the Firm had a motion for reconsideration of the remand order pending before the district court. That motion was later denied.

[5]Math again confounds those learned in the law. Both the Trustee's proposed award and the arbitrators' supplemental award state that one-third of the total fee amount of $3,547,514.24 is equal to $1,182,513.74. It is not. The correctly calculated amount should be $1,182,504.75. (The incorrect figure may be arrived at by taking one-third of $3,547,5*41*.24, rather than $3,547,5*14*.24—and rounding it to the nearest cent incorrectly.)

should have been vacated under the § 10(a) factors.  All of these arguments fail: For both the original and supplemental awards, none of the grounds for vacation are appropriate, and the district court's and panel's actions unambiguously fall under the clarification exception to *functus officio*.  Other miscellaneous arguments raised by the Firm, likewise without merit, are addressed at the end of this section.

A

The Firm insists that the arbitrators' original award was compromised according to at least one of the four factors allowing vacation under 9 U.S.C. § 10(a).  *See* Arbitration Agreement at 3 ("The arbitration decision shall not be challenged by either party except for the grounds set forth in 9 U.S.C. § 10(a) [vacation] or 9 U.S.C. § 11 [modification or correction].").  Section 10(a) permits a district court to vacate an arbitration award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

The Firm's clearest argument that the original award should have been vacated falls under § 10(a)(4).  Because the parties bargained for a "brief reasoned decision," and the arbitrators delivered something else, the Firm asserts that they exceeded their powers.  *See, e.g.*, *Green v. Ameritech Corp.*, 200 F.3d 967, 975 n.6 (6th Cir. 2000) ("[W]e shall assume without deciding that an arbitrator can exceed his powers in violation of § 10(a)(4) by failing to fulfill his obligations, as opposed to by overstepping the bounds of his authority.").  But this court has never squarely held that a dearth of explanation constitutes a § 10(a)(4) violation—indeed, the subsection's plain language seems to contradict that reading.  To "exceed" one's authority is "to go beyond a limit set by" it.  *See Merriam-Webster's Dictionary* (online ed. 2022) (last visited

Mar. 14, 2022) (using "exceeded his authority" as the example phrase). But in this case, the authority granted to the arbitrators did not prohibit them from issuing a disposition: it *required* that disposition as well as the reasoning behind it. The text of the original award was therefore within the "limit set by" the arbitrators' powers, so it did not exceed them. The issue is simply that more was required of the panel.

As this court has explained, "if the district court were correct in its conclusion that [the] Arbitrator . . . failed to explain his award, the proper remedy would have been a remand to the same arbitrator for clarification." *Green*, 200 F.3d at 978. That principle makes sense. The proper remedy for falling short of the level of explanation agreed to by the parties is remanding back to the panel, rather than starting from scratch.[6] *See id.* at 977 (citing *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 847 (7th Cir. 1995) (Posner, C.J.)). *See also infra* Part II.B (discussing *Excelsior Foundry* and "the clarification-completion exception (or exceptions) to functus officio," 56 F.3d at 848).

Section 10(a)(4) also allows an arbitration award to be vacated if it was made in "manifest disregard of the law." *See Grain v. Trinity Health, Mercy Health Servs. Inc.*, 551 F.3d 374, 380 (6th Cir. 2008)). This test, we have said, is part and parcel of the statutory prohibition against the arbitrators' "exceed[ing] their powers," because "[a]rbitrators do not exceed their authority unless they display a manifest disregard of the law." *Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 866 (6th Cir. 1990). But the outrageous circumstances required for this court to find manifest disregard are clearly not met here. *E.g.*, *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000) ("An arbitration panel acts with manifest disregard if '(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.'" (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995))); *Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient. . . . Rather, the decision must fly in the face of clearly established legal precedent." (citation omitted)); *Federated Dep't Stores*, 866 F.2d

---

[6]If the Firm's argument is instead that the panel's failure to issue a brief reasoned decision was an imperfect execution of the arbitrators' powers, it was not "*so* imperfectly executed" as to violate § 10(a)(4), because it was all the things required under that subsection: "mutual, final, and definite." 9 U.S.C. § 10(a)(4) (emphasis added).

at 866 ("[A]llegations of errors in interpretation . . . fail[ ] to prove that the arbitrators displayed a manifest disregard of the law.").

The closest the Firm comes to arguing manifest disregard is its assertion that the brevity of the original award "effectively precluded any legal challenge." But the Firm's failure to identify any "evidence that the arbitrators were aware of some relevant law . . . that they chose to ignore" is fatal to its claim. *Dawahare*, 210 F.3d at 671. And indeed, the cases it cites in support of its manifest-disregard argument unambiguously reject the theory. *See ibid.* (noting that while it was "*possible* to argue that the arbitrators misapplied the law," that was insufficient for manifest disregard (emphasis added)); *Murray v. Citigroup Glob. Mkts., Inc.*, 511 F. App'x 453, 455 (6th Cir. 2013) (rejecting manifest-disregard claim in part because "none of [appellant's] arguments derive from a law-based analysis," but were instead "thinly veiled attempts to relitigate factual determinations"). Instead, where no evidence can be presented that the arbitrators disregarded applicable law, "the proper remedy" is "a remand to the same arbitrator for clarification." *Green*, 200 F.3d at 978. The Firm has thus failed to show that the original arbitration award should have been vacated.

## B

The doctrine of *functus officio* prohibits an arbitrator from reopening a case after "having performed his or her office"—hence the name. *Black's Law Dictionary* 815 (11th ed. 2019). *Functus officio* likens the end of arbitration to a judge's resignation, given that the arbitrators leave, in effect, a temporary judgeship to return to their full-time professions. The doctrine thus recognizes that allowing a post-resignation rehearing would be inappropriate, as the less-professional adjudicators become more open to informal communications. *Excelsior Foundry*, 56 F.3d at 846–47. The judge-made doctrine initially served its purpose as a check on arbitration, but "[t]oday, riddled with exceptions, it is hanging on by its fingernails"—as Judge Richard Posner recognized in 1995. *Id.* at 846.

Among those many exceptions is what Judge Posner called the "clarification-completion exception—or exceptions." *Id.* at 848. In this court's words, "[c]ourts usually remand to the original arbitrator for clarification of an ambiguous award when the award fails to address a

contingency that later arises or when the award is susceptible to more than one interpretation"; remand is also appropriate based on "a failure fully to explain an award"—provided that "the parties' agreement imposed a duty of explanation on the arbitrator." *Green*, 200 F.3d at 977 & n.9.

Notwithstanding the clarification-completion exception, the Firm argues on appeal that *functus officio* was violated here in two separate instances: first, when the district court decided to remand back to the original arbitrators, despite the fact that they had already issued a decision; and second, when the arbitrators requested supplemental submissions from the parties, despite the fact that the merits of arbitration were already closed. In both instances, it is incorrect.

In the District Court

The Firm claims that the arbitrators' first award could not possibly be reopened under the clarification-completion exception, because it was so brief as to be "incapable of 'clarification.'" First Br. of Defendant-Appellant/Cross-Appellee 21. According to the Firm's understanding, a decision that is "incapable of being misunderstood"—like a short statement that "Respondent is liable"—fails to create any ambiguity susceptible to clarification. *Ibid.* Plain English belies this linguistically confusing argument. An umpire who calls "strike" rather than "ball" has issued a brief, unambiguous judgment. The call itself can only be understood in one way—the ball was in the strike zone—but the reasoning *behind* it could be explained in any number of ways. (Was it at the knees? Or did it graze the edge of the plate?) Only by asking the umpire for clarification can the batter understand why he is skulking back to the dugout instead of trotting to first. So too, here, the mere fact that an arbitration decision is unambiguous in its result does not make its reasoning incapable of clarification. This is especially so when the parties have contracted for a "brief reasoned decision"—"something short of findings and conclusions but more than a simple result." *Id.* at 20 n.9 (quotation marks omitted). It is the reasoning behind the decision, not the simple result, that requires clarification.

Because the arbitrators' first award was plainly capable of clarification, the proper remedy was remand to the original arbitrators, and the district court thus correctly disposed of the first award by remanding under the clarification-completion exception to *functus officio*.

On Remand

The Firm additionally argues that, once the case was remanded to the arbitrators, their actions violated *functus officio* by exceeding the specific mandate given to them by the district court. Far from simply clarifying their initial award, the Firm argues, the arbitrators reopened the merits of the case and thereby ran afoul of *functus officio*.

The Firm takes issue with the arbitrators' decision to solicit additional findings from the parties,[7] claiming that nothing in the district court's remand order allowed for this action (while the Trustee retorts that nothing in the district court's order forbade it). According to the text of the order, the district court requested that the arbitrators "clarify the award by including, *but not necessarily limited to* [sic], the following information: 1) A discussion of Plaintiff's claims, 2) A discussion of Defendant's defenses, [and] 3) The Arbitrators' justification for the award." It is reasonable to assume that, having ruled in the Trustee's favor, the arbitrators already believed that he had the better argument, and (as the district court explained) the purpose of remand was to clarify some important questions that remained: What were the "claims and defenses of the parties" (as required by the arbitration agreement)? Had the Trustee prevailed on his breach-of-contract claim or his quantum-meruit claim? And how had the panel calculated its award of interest? In order to comply with the district court's order, it was entirely appropriate to ask the parties to explain claims and defenses.

Acknowledging, then, that the panel requested submissions not to reconsider the merits, but to arrive at the parties' bargained-for "brief reasoned decision," the Firm's argument falls apart. Considering the counterfactual in which the panel refused to request submissions, the Firm could have repeated its argument that the three-month period between initial award and remand was so long as to leave the arbitrators clueless as to what the parties had presented at the four-day hearing. The Firm argues both sides, complaining both that the time gap was too expansive to guarantee accuracy, and that the panel should have been prohibited from requesting proposed findings from the parties to ensure fidelity to their arguments. Both in the district court

---

[7]A discussion as to whether it was proper for the arbitrators to accept and adopt findings only from the Trustee follows in Part II.C, because that issue concerns § 10(a) vacation rather than *functus officio*.

and on remand, the clarification exception to *functus officio* shields the arbitrators from the Firm's claim that they improperly modified the award.

## C

Lastly, the Firm repeats its argument that vacating under the Federal Arbitration Act was appropriate, this time with respect to the supplemental award. The Firm argues that when the arbitrators solicited and accepted the Trustee's proposed findings on remand, they violated each of § 10(a)'s four factors, thereby allowing the district court to vacate the arbitral award.

With respect to § 10(a)(3)–(4), the Firm asserts that it was "misconduct" or else "the exceeding of their powers, and/or imperfectly executing such powers" for the arbitrators to accept the Trustee's proposed findings on remand. *See* 9 U.S.C. § 10(a)(3)–(4). But in line with the district court's remand instructions—to discuss "Plaintiff's claims" and "Defendant's defenses"—the panel solicited proposed findings from *both* parties. As discussed in the preceding section, the purpose of remand was to cure the arbitrators' initial insufficient reasoning when they failed to "include all claims and defenses of the parties" as interpreted by the district court. For the same reason that the arbitrators' actions did not reopen the merits, then, it did not constitute misconduct or exceed the scope of their instructions on remand to solicit additional submissions from the parties.[8] Generously construed, the Firm's § 10(a)(3)–(4) argument is that the arbitrators' actions on remand were so one-sided as to require vacating. The failure with which the Firm takes issue, then, is its own refusal to provide a summary of its arguments when the arbitrators requested that it do so. It cannot now twist its actions into misconduct on the part of the arbitrators.

With respect to § 10(a)(1)–(2), the Firm argues that the panel's soliciting findings from both parties, but only receiving submissions from the Trustee, constituted ex parte contact that "raises a presumption that the arbitration award was procured by fraud, corruption, or other

---

[8]Nor was it improper execution of the arbitrators' powers. The statutory language permits vacation on this ground only when the arbitrators' powers were "*so* imperfectly executed" that "a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Because the text focuses exclusively on the award, imperfect execution is not an analysis of the procedure leading to that award. And as discussed above, the award here was sufficiently "mutual, final, and definite" that no imperfect-execution argument can be maintained. *See supra* n.6.

undue means." First Br. of Defendant-Appellant/Cross-Appellee 42 (citing *Hahn v. A.G. Becker Paribas, Inc.* 518 N.E.2d 218, 223 (Ill. App. Ct. 1987)); *see also* 9 U.S.C. § 10(a)(1)–(2). It is true that ex parte communication has been cited as a potential ground for vacating an arbitration award, though not all ex parte contact raises the specter of a violation of § 10. *E.g.*, *Star Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 656 F. App'x 240, 257 (6th Cir. 2016) (vacating an arbitration award where the parties specifically contracted for a ban on ex parte communications and defendant's attorney later engaged in multiple extended telephone calls with one of the arbitrators); *cf. Excelsior Foundry*, 56 F.3d at 846 ("An ex parte contact is not an automatic ground for invalidating such an award. The contact would have to trigger one of the recognized grounds for vacation, such as partiality on the part of the arbitrator.").

But it is hard to see how the arbitrators' actions here were ex parte at all—that is, "taken or received by one party without notice to the other." *Black's Law Dictionary* 722 (11th ed. 2019). Counsel for the Firm was copied on all of the emails between the Trustee's counsel and the arbitrators, and without a formal court filing system or any centralized address for the arbitration panel, email was clearly the preferred method of communication. The alternative would be coordinating a logistically complex conference call, video call, or in-person hearing. The Firm had every opportunity to respond to the messages regularly appearing in its inbox, and in fact it *did* respond to engage in a discussion with opposing counsel and the arbitrators about its pending motion for reconsideration. In any case, because notice, not participation, is the touchstone of ex parte contact, the Firm cannot refuse to respond to emails on which it was copied and later claim that those communications were made ex parte. *E.g.*, *Brooks v. Spiegel*, No. 1:18-cv-12, 2018 WL 5833064, at *3 (E.D. Tenn. Nov. 7, 2018) (pointing out that the prohibition on ex parte communication "would not prohibit a lawyer from communicating with a judge on the merits of the cause in writing if the lawyer promptly delivers a copy of the writing to opposing counsel, . . . because that would not be an ex parte communication" (quoting Tenn. R. Prof. Conduct 3.5(b))).

In summary, the Firm's myriad assertions that the arbitrators' accepting the Trustee's proposed findings was misconduct, or exceeded the arbitrators' powers, or were an imperfect execution of those powers, or constituted ex parte contact, are unfounded.

D

The Firm's main claims disposed of, we hold additionally that its miscellaneous arguments regarding the impropriety of the arbitration and review by the district court are also without merit. Those arguments claim variously that the act of remanding for supplemental arbitration allowed the panel to invent a post hoc justification for its bare-bones decision, that the arbitrators were tainted by outside communications and unilateral influences, and that the supplemental award improperly modified the initial interest calculation.

First, the Firm claims that the ill-gotten benefit of remand was to allow the panel to invent a justification after the fact. The only evidence it offers is, again, the arbitrators' adopting the Trustee's proposed findings. But there are at least two other plausible reasons the panel embraced the explanation offered by the Trustee. One, the panel simply *agreed* with the Trustee, for whom it had ruled in the first place. And two, because the district court had specifically asked for discussions of "Plaintiff's claims" and "Defendant's defenses." As with the earlier discussion of the arbitrators' conduct leading up to the supplemental award, the Firm's refusal to respond to requests from the arbitrators—indeed, requests that were directly related to the district court's order—is not grounds for vacation. The Firm has failed to adduce evidence to the contrary.

Second, the Firm argues that the panel was subject to improper unilateral influence, citing its own communications with the arbitrators asking for a post-award, pre-remand clarification and an affidavit it solicited from the dissenting arbitrator. The argument appears to be that, once an arbitration decision issues, *any* further communication initiated by the parties with the arbitrators irreparably taints the proceedings because it violates *functus officio*. This is a literalist reading of Judge Posner's observation in *Excelsior Foundry* that "like Cincinnatus returning to his plow . . . [o]nce they return to private life, arbitrators are less sheltered than sitting judges," and therefore more open to undue post-judgment influences. 56 F.3d at 847. But in the very same paragraph, Judge Posner observes that if "functus officio[ ] disables [the arbitrator] from considering a motion for reconsideration, clarification, amendment, or other modification . . . [t]he result would be a gap in the system of arbitral justice that would make very little sense." *Ibid.* For that reason, it is the bar on ex parte contact, rather than a bar on communications of

any kind, that most effectively addresses concerns about unilateral influence. *Ibid.* And in this case, as discussed above, no such ex parte contact took place. Even if it were not the case that— once again—the Firm appears to have drawn this argument of impropriety from its own actions, the argument would not hold water.

Third and finally, the Firm takes issue with the arbitrators' calculation of interest in the supplemental award. The initial decision awarded "damages, including interest to date," without showing how much of the sum was the principal and how much was interest. The supplemental award then explained that the initial interest calculation was "$142,734.10 through November 12, 2019," the date of the initial award.[9] As the district court noted, the Firm raised its objections to pre-judgment interest in its motion to vacate the original award and its motion to vacate the supplemental award, in both cases failing to recognize that the parties had contractually agreed to "apply Michigan substantive law to determine issues of liability and damages" in arbitration, and that "Michigan law explicitly provides for prejudgment interest by statute." Because the Firm raises no arguments apart from those that the district court twice considered and rejected, there is no reason to further address those arguments here.

With respect to post-judgment interest, the Firm asserts that the supplemental decision awarded "***additional*** interest through satisfaction of any judgment," which "demonstrates that the Arbitrators were altering and modifying their previous decision." First Br. of Defendant-Appellant/Cross-Appellee 43 (emphasis in original). Not so. Michigan law specifically contemplates that when a judicial, arbitral, or other body issues an award arising from a contract, interest on the award may run until it is paid or until it is enforced by the entry of judgment by a court:

> In all actions founded on contracts . . . whenever in the execution thereof any amount in money shall be liquidated or ascertained in favor of either party, by . . . award of arbitrators . . . it shall be lawful . . . to allow and receive interest upon such amount so ascertained or liquidated, *until payment thereof* or until judgment shall be thereupon rendered.

---

[9]Here, the math is correct. The supplemental decision awarding $1,182,513.74, plus interest until the date of the initial award of $142,734.10, correctly adds up to the initial award of $1,325,247.84 ("damages, including interest")—meaning there was no change in the amount of damages between the initial and supplemental awards.

Mich. Comp. Laws § 438.7 (emphasis added).  It was therefore within the arbitrators' discretion to clarify that interest on their earlier award would continue to run until the satisfaction of that decision by the Firm, even after the district court entered judgment.  Indeed, there was no new description of interest here, because the original award (brief as it was) described interest calculated "to date," implying that it would continue to run until satisfied.  In short, neither of the Firm's arguments as to calculation of interest is convincing, because all the interest calculated by the arbitrators complies with Michigan law—the law governing "issues of liability and damages" under the parties' arbitration agreement.

* * *

"Arbitrators are no more infallible than judges.  They make mistakes and overlook contingencies and leave much to implication and assumption—as the present case illustrates." *Excelsior Foundry*, 56 F.3d at 847.  But we will not punish the district court for criticizing the arbitrators' taciturnity, nor the arbitrators for explaining themselves more fully on remand.  When arbitrators fail to fulfill their duties of explanation as contracted for by the parties, the remedy recognized by this court is "a remand to the same arbitrator[s] for clarification"—exactly what happened here.  *Green*, 200 F.3d at 978.  The decision of the district court confirming the supplemental arbitration award is affirmed.

III

The Trustee cross-appeals the bankruptcy court's earlier grant of summary judgment dismissing his conversion claim.  "On appeal from a bankruptcy court's decision granting summary judgment, we review the bankruptcy court's factual findings for clear error and its legal conclusions de novo." *In re Wells*, 561 F.3d 633, 634 (6th Cir. 2009).

Michigan recognizes both statutory and common-law claims for conversion.  Both types of conversion require a "distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015).  When that property is money, "the defendant [(1)] must have obtained the money without the owner's consent [(2)] to the creation of a debtor-creditor relationship and [(3)] must have had an obligation to return the

specific money entrusted to his care." *Bastin v. Welch*, No. 251652, 2021 WL 2025148, at *4 (Mich. Ct. App. May 20, 2021) (citing *Lawsuit Fin., LLC v. Curry*, 683 N.W.2d 233 (Mich. Ct. App. 2004)). "[T]he separate statutory cause of action for conversion" codified at Mich. Comp. Laws § 600.2919a imposes an additional requirement, "a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines*, 871 N.W.2d at 149; *see also id.* at 147 (describing "the additional statutory requirement that the conversion was to the other person's 'own use'").

A Michigan statutory-conversion claim awards treble damages if successful. *See* Mich. Comp. Laws § 600.2919a(1) (providing for treble damages, "plus costs and reasonable attorney fees"). A claim at common law, however—that is, one that fails to meet the additional statutory pleading requirement of "own use"—awards only actual damages. *Aroma Wines*, 871 N.W.2d at 145–48. In this case, the Trustee is already entitled to actual damages (the full sum of attorney's fees owed to Romanzi, plus interest), due to our holding above affirming the breach-of-contract award.[10] We therefore address only the Trustee's statutory-conversion claim because of the additional damages such a claim would support. *See* 22 Am. Jur. 2d Damages § 40 ("[A] double or duplicative recovery for a single injury is invalid.").

Yet the Trustee's statutory-conversion claim must fail because the Trustee has never shown how the Firm put Romanzi's funds to the Firm's "own use." Indeed, the Trustee set forth no evidence in the bankruptcy proceeding about what the Firm had done with the funds. His

---

[10]Under Michigan law, claims for breach of contract and the tort of conversion can be mutually exclusive. "A party's conduct may constitute both a breach of contract and an act of conversion only if there was a breach of a duty separate and distinct from the contractual duty." *Can IV Packard Square, LLC v. Packard Square, LLC*, Nos. 348857 & 350519, 2021 WL 2617988, at *18 (Mich. Ct. App. June 24, 2021); *see also Hart v. Ludwig*, 79 N.W.2d 895, 898 (Mich. 1956) ("What we are left with is defendant's failure to complete his contracted-for performance. This is not a duty imposed by the law upon all . . . . A tort action will not lie."). That duty could be a fiduciary one. *See, e.g.*, *Can IV Packard Square*, 2021 WL 2617988, at *18 (rejecting plaintiff's claim that he was owed a fiduciary duty and subsequently holding that he could not maintain an action for conversion separate from breach of contract). Here, the Trustee claims that the Firm did in fact owe a fiduciary-like duty to Romanzi—and therefore his conversion claim stands in addition to his breach-of-contract claim—because the Michigan Rules of Professional Conduct impose special responsibilities on attorneys entrusted with funds on behalf of a "third person." Fourth Brief of Plaintiff-Appellee/Cross-Appellant 5 (citing Mich. R. Prof. Conduct 1.15(b)(1)). Because we dispose of the Trustee's conversion claim on other grounds, however, there is no need to explore which duty or duties Romanzi was owed here.

summary-judgment motion merely asserted in conclusory fashion that "Defendants have converted the disputed fee to their own use," omitting any supporting citation to the record explaining the nature of that use. And, at a subsequent hearing on the motion, the bankruptcy judge noted that the Trustee "concede[d] he has no idea what happened to the fees paid to the firm." Having failed to establish the "own use" element of statutory conversion, therefore, the Trustee is not entitled to collect treble damages, and his conversion claim fails.

IV

For the reasons above, we **AFFIRM** the judgments of the district court and bankruptcy court.